UNITED STATES of America, Plaintiff,

v.

Michael MEDJUCK, and Arthur John Jung, aka Charles Peter Sotirkys, Defendants.

No. CR–91–0552 EFL.

United States District Court, N.D. California.

June 17, 1996.

Lewis Davis, Mary Pougalis, U.S. Attorney's Office, San Francisco, CA, for plaintiff.

John Markham, San Francisco, CA, Doron Weinberg, San Francisco, CA, Arthur Wachtel, San Francisco, CA, for defendants.

*AMENDED MEMORANDUM OPINION* *

LYNCH, District Judge.

I. INTRODUCTION

This case charges the defendants with a maritime conspiracy spanning several years and various nations. The object was to im-

---

* This Amended Memorandum Opinion is issued to correct several factual errors contained in the Court's May 30, 1996 Memorandum Opinion and pointed out in the government's letters of May 31, 1996 and June 5, 1996.

port 70 tons of hashish from Pakistan to North America aboard a freighter called the Lucky Star. The 70–ton load of hashish made its way to the middle of the Pacific Ocean. Over two tons of hashish were transferred from the Lucky Star to an offload vessel and taken to California, where a number of the conspirators were arrested. The maritime drug conspiracy ended after the United States Navy interdicted the Lucky Star and its 68 remaining tons of hashish on the high seas.

Defendants Michael Medjuck and Charles Peter Sotirkys [1], along with defendants Dennis Feroce, Jack Hayden, Raymond Ainge, Barry Shantz, and Larry Stanley, were charged in a 23–count superseding indictment with, *inter alia*, three counts of violating the Maritime Drug Law Enforcement Act, ("MDLEA"), 46 U.S.C.App. § 1903, relating to the 70 tons of hashish on board the Lucky Star.[2] The MDLEA prohibits the possession, manufacture, or distribution of controlled substances on board a vessel subject to the jurisdiction of the United States. 46 U.S.C.App. § 1903.[3]

This Court initially ruled that the government did not have the burden of showing a nexus between the defendants and the United States in order to proceed with this prosecution. The Court also ruled that, as a matter of law, the *Lucky Star* was a vessel subject to the jurisdiction of the United States. On April 16, 1993, defendant Medjuck entered a conditional plea of guilt, reserving the right to appeal the Court's ruling on the issue of nexus. On April 29, 1993, a jury returned a verdict of guilt on the three MDLEA counts against defendant Sotirkys.[4] Following the verdict against Sotirkys, on

August 30, 1993, this Court issued an Order of clarification holding that there was sufficient evidence of nexus, including both evidence that the conspiracy was conducted in part in the United States, and evidence "from which a reasonable jury could conclude that the hashish was intended for distribution in the United States." Defendants Medjuck and Sotirkys both appealed.

In *United States v. Medjuck*, 48 F.3d 1107 (9th Cir.1995), the Ninth Circuit ruled that this Court erred "by not submitting to the jury the question whether the Lucky Star was 'a vessel subject to the jurisdiction of the United States.'" *Medjuck*, 48 F.3d at 1110. *Medjuck* held that the statutory jurisdictional requirement of the MDLEA is an element of the offense and therefore a question for the jury. *Id.* The *Medjuck* court also ruled a prosecution pursuant to the MDLEA required a showing that it did not violate due process. *Id.* at 1110–11. The court held that "[d]ue process is not offended as long as there is a sufficient nexus between the conduct condemned and the United States." *Id.* at 1111. *Medjuck* held that this Court "erred by ruling as a matter of law that the government need not demonstrate nexus in this case." *Id.* The court held that "the government has the burden of demonstrating such a nexus and that the defendants should have the opportunity for rebuttal on remand." *Id.* The matter was reversed and remanded.

A number of issues regarding nexus have been raised, including whether nexus is an issue for the Court or for the jury, the applicable standard of proof, and the appropriate definition of nexus. The Court held

1. Charles Peter Sotirkys is an alias for Arthur John Jung. For consistency's sake, this defendant will be referred to as Charlie Sotirkys throughout.

2. Defendants Feroce, Hayden, Shantz and Stanley pleaded guilty and have been sentenced. Defendant Ainge's conviction on the MDELA counts has recently been reversed and remanded. His convictions on the remaining counts were affirmed.

3. Specifically, § 1903(a) makes it "unlawful for any person ... on board a vessel subject to the jurisdiction of the United States ... to knowingly or intentionally manufacture or distribute, or to

possess with intent to manufacture or distribute, a controlled substance." Subdivision (c) defines a "vessel subject to the jurisdiction of the United States" in pertinent part as "(A) a vessel without nationality; (B) a vessel assimilated to a vessel without nationality [or] ... (C) a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States Law by the United States...."

4. Sotirkys was acquitted of the other counts, including those related to the 2.4 tons brought to the United States.

an evidentiary hearing on nexus on February 27 and 28 and April 3, 1996. In an Order dated April 4, the Court memorialized the oral ruling it made on these issues prior to the nexus hearing. The Court found that the government had borne its burden of showing nexus with respect to defendant Sotirkys, but at Medjuck's request, deferred its ruling on nexus until his Rule 29 motion. The Court also denied defendant Sotirkys' motion to dismiss the indictment on double jeopardy grounds, but permitted him to file an interlocutory appeal. The Court severed defendants Medjuck and Sotirkys, and Medjuck's trial began on April 10, 1996. Medjuck was convicted of Counts 1, 2, and 3 of the superseding indictment and acquitted of the charges relating to the offloaded 2.4 tons.

In this opinion, the Court explains its reasoning on nexus issues. The Court holds that nexus is a question for the Court rather than for the jury, and that the government has the burden of showing nexus by a preponderance of the evidence. The Court also defines nexus, which is a due process requirement, as a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests. Finally, the Court finds that nexus has been shown as to defendant Medjuck and defendant Sotirkys.

## II. LEGAL ANALYSIS

### A. *Who Decides Nexus?*

 The first question the Court addresses is that of who decides nexus, namely, whether it is a question for the Court or for the jury. Following the decision in *Medjuck,* all parties appeared to have assumed, as did this Court, that nexus was a matter for the Court to determine following an evidentiary hearing. In keeping with that assumption, an evidentiary hearing was scheduled. During the course of briefing regarding the hearing, defendants cited *United States v. Amparo,* 68 F.3d 1222 (9th Cir.1995). In *Amparo,* a decision about whether possession of an unregistered sawed-off shotgun was, as a matter of law, a "crime of violence," the Ninth Circuit stated:

[i]n *Medjuck,* we held that whether a vessel is within the jurisdiction of the United States—an element of a maritime drug statute—required a factual determination as to whether there was a nexus between the United States and the defendants. The court erroneously made that determination as a matter of law. It should have instructed that the jury must find nexus in order for the court to have jurisdiction.

*Id.* at 1226.

In addition, while the nexus hearing was being held, the Ninth Circuit's decision in the appeal of Raymond Ainge was rendered. Ainge, one of Medjuck's co-defendants, was convicted of, *inter alia,* the 3 MDLEA counts of the superseding indictment. In an unpublished, per curiam opinion, the Ninth Circuit stated:

We reversed in *Medjuck* because the district court failed to instruct the jury to establish the statutory and constitutional jurisdictional requirements for conviction under the MDLEA by finding that the Lucky Star was a vessel subject to the jurisdiction of the United States, and that a sufficient nexus existed between the conduct condemned and the United States.

*United States v. Raymond Sander Ainge,* No. 94–10589 slip op. at 2, 1996 WL 155137 (9th Cir. Apr. 2, 1996).

*Amparo* and *Ainge* opened up the question of who decides the issue of nexus, and this question has been thoroughly briefed and argued. The statements in these two cases interpreting *Medjuck* as requiring that the question of nexus be submitted to the jury has given this Court serious pause, particularly in light of the fact that one Ninth Circuit judge heard the appeals of both *Medjuck* and *Ainge.*[5] However, the Court has carefully reviewed the *Medjuck* opinion, has analyzed the MDLEA and the case law interpreting it, and has reviewed the meaning of the due process requirement of nexus. In light of this analysis, and for the reasons set forth in greater detail *infra,* the Court is compelled to conclude that the statements in *Amparo* and *Ainge* are both dicta and inaccurate. For a number of reasons, the Court

---

**5.** The Honorable Mary M. Schroeder sat on both the *Medjuck* and *Ainge* panels.

finds that it, rather than the jury, should determine nexus.

### 1. *Medjuck Decision*

In making this determination, the Court first looks to the Ninth Circuit's decision in *Medjuck*. There, the Ninth Circuit analytically separated the statutory and constitutional requirements of jurisdiction. In section 1 of its discussion, titled *"Jurisdiction"*, the *Medjuck* court noted that "[d]efendants contend that the district court erred by determining as a matter of law that the statutory and constitutional requirements for assertion of subject matter jurisdiction were satisfied in this case." In subsection a, captioned *"Statutory Requirements"*, the Court held that whether a vessel is "subject to the jurisdiction of the United States" "is an element of the crime charged and therefore must be decided by the jury." *Medjuck*, 48 F.3d at 1110. The Ninth Circuit explicitly held that it was error "not to submit the jurisdictional element to the jury." *Id.*[6] In subsection b, titled *"Constitutional Requirements"*, the Ninth Circuit turned to the constitutional element of jurisdiction and held that the Due Process Clause of the Fifth Amendment required the government to demonstrate "a sufficient nexus between the conduct condemned and the United States." *Id.* at 1110–11. In its discussion of the constitutional requirements of jurisdiction, the Ninth Circuit did not say that the question of nexus was a question for the jury, as it explicitly held in discussing the statutory requirement that a vessel be subject to the jurisdiction of the United States. Instead, the Ninth Circuit held "neither defendant has had the opportunity to rebut the evidence relied upon by the district court in its clarification order." *Id.* at 1111. The Ninth Circuit did not state that it was error for the Court, rather than the jury, to make this determination, but rather found that it was error to do so in the absence of an opportunity for rebuttal by the defendants. It appears that if the Ninth Circuit were holding

that the question of nexus was one for the jury, it would have expressly said so.

A careful reading of *Medjuck* thus shows two holdings: first, the government must prove to a jury beyond a reasonable doubt that the vessel is "a vessel subject to the jurisdiction of the United States" within the meaning of the MDLEA; second, the government "has the burden of demonstrating" a nexus between the "conduct condemned and the United States." *Id.* These two holdings are set forth in the *Conclusion,* in which the Ninth Circuit held "that the district court erred by not submitting the jurisdictional element of the crime to the jury and by ruling that the government was not required to demonstrate a nexus between defendants and the United States." *Id.*

Not only does a close reading of *Medjuck* demonstrate that nexus is not a jury question, a review of the oral argument before the Ninth Circuit, although certainly not determinative, lends support to the proposition that it is a court question. At the beginning of oral argument, Judge Pamela Rymer questioned whether there were "two components to a jurisdictional inquiry" in this case, noting both the statutory element of jurisdiction, and the "overlay question of whether there is a due process, as to compliance and whether exercising jurisdiction enforcement in due process. *Clearly, the due process inquiry, it seems to me, could not possibly be a jury question."* (Emphasis added.) To this statement, counsel for Medjuck agreed by saying "No." Counsel for Medjuck continued to contend that defendants were entitled to an evidentiary hearing on the issue, arguing that Medjuck was asking for the Ninth Circuit first to rule that nexus was required, secondly, to define nexus, and finally, to require an evidentiary hearing. He did not suggest in oral argument that nexus was a question to be submitted to the jury. Counsel for Sotirkys argued that based on the Court's pretrial ruling, he presented no evidence of nexus and submitted that he was entitled to a hearing on remand to determine

---

**6.** For similar holdings, *see, United States v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (holding "materiality" is an element of the offense proscribed in 18 U.S.C. § 1001 and is therefore a question for the jury); *United*

States v. Nukida, 8 F.3d 665 (9th Cir.1993) (holding the term "affecting interstate commerce" as used in product tampering statute is an element of the offense and therefore to be submitted to the jury).

whether nexus was shown as to him. He also did not argue in oral argument that he was entitled to present the question of nexus to the jury. In colloquy with counsel for the government, Judge Rymer stated that this Court "didn't instruct the jury to find [nexus]. Although, if the jury was to find, if the jury was instructed ..." However, that inquiry was never pursued. Counsel for the government asserted that nexus could be proved at trial, and that an evidentiary hearing was not required.

The Court is aware that statements of individual judges during an oral argument are not binding in any way. However, since the Court is in a position of resolving the ambiguities left by the decisions in *Medjuck*, *Amparo*, and *Ainge*, statements in oral argument are instructive. Several things can be gleaned from the colloquy. First, it suggests that the defendants explicitly sought an evidentiary hearing on remand, and did not ask for remand of the nexus issue to the jury. Second, it suggests that the focus of the judges on the panel was whether the defendants were entitled to an evidentiary hearing. Finally, the question of whether the issue could be determined at trial, rather than by an evidentiary hearing, was raised by counsel for the government. However, though invited to do so by the government, the Ninth Circuit did not explicitly rule that the nexus question should be submitted to the jury. Instead, the *Medjuck* opinion held that "the government has the burden of demonstrating such a nexus and the defendants should have an opportunity for rebuttal on remand." *Medjuck*, 48 F.3d at 1111. Accordingly, the decision in *Medjuck*, as illuminated by the oral argument, holds that an evidentiary hearing, rather than a jury determination, is required.

### 2. *Amparo and Ainge*

Both *Amparo* and *Ainge* read *Medjuck* as holding that nexus was a jury question. The *Amparo* Court stated that *Medjuck* held that this Court "should have instructed that the jury must find nexus in order for the court to have jurisdiction." *Amparo*, 68 F.3d at 1226. In *Ainge*, the Ninth Circuit stated that it had reversed in *Medjuck* because this Court did

not submit both the statutory jurisdictional question and the constitutional nexus question to the jury. *Ainge*, slip op. at 2, 1996 WL 155137. A review of these cases demonstrates that these comments were both dicta and inaccurate readings of *Medjuck*.

In *Amparo*, the issue before the Court was whether possession of an unregistered sawed-off shotgun was, as a matter of law, a "crime of violence" within the meaning of 18 U.S.C. § 924(c)(3)(B). The *Amparo* trial court instructed the jury that such possession is a crime of violence as a matter of law. The Ninth Circuit affirmed, finding that the question is not properly committed to the jury. The court held "whether possession of a sawed-off shotgun is a crime of violence is a matter of law once the jury has determined the factual predicate that the defendant possessed an unregistered sawed-off shotgun." *Id.* at 1226. In dicta, the *Amparo* court distinguished its case from *Medjuck*, characterizing *Medjuck* as having held that this Court "should have instructed that the jury must find nexus in order for the court to have jurisdiction." *Id.* The *Amparo* court did not analyze the MDLEA, the meaning of nexus, or the jurisdictional prerequisites in a case involving a drug seizure on the high seas.

While *Ainge* directly addressed the MDLEA, its reference to jury consideration of nexus was dicta. Defendant Ainge was convicted of three counts of violating the MDLEA and of several counts relating to the 2.4 ton California load. On appeal, he argued that his MDLEA convictions should be reversed because they

suffer[ed] from the same errors that compelled [the Ninth Circuit] to reverse codefendants' convictions in *United States v. Medjuck* ... specifically, the refusals to instruct on the jurisdictional element essential under the MDLEA and to require the government to show nexus necessary to satisfy the Due Process Clause.

Opening Brief for Defendant–Appellant Ainge at 7. Defendant Ainge argued that this Court's failure to instruct on the jurisdictional element of the MDLEA was reversible error in *Medjuck*, and that his MDLEA convictions "were secured by the same revers-

ible errors in instruction." Opening Brief at 11. Ainge additionally argued that this error "tainted jurors' comprehension and deliberation of the entire case" and on that basis sought reversal of all counts. In a separately articulated argument, Ainge contended that his due process rights were violated by the Court's ruling that the government need not prove nexus. He specifically protested that he "was deprived of any evidentiary hearing on nexus." Opening Brief at 12. The government conceded that Ainge's maritime drug convictions "must be reversed for the reasons stated in *Medjuck*, 48 F.3d at 1101–11: failure both to demonstrate nexus and to submit to the jury the question of whether the United States had jurisdiction to prosecute under the Maritime Act." Appellee's Brief at 33–34.

In reversing Ainge's MDLEA convictions, the Ninth Circuit stated that the convictions of Medjuck and Sotirkys were reversed "because of infirmities in the jury instructions," slip op. at 2, 1996 WL 155137, and noted that the government conceded that Ainge's convictions "must be reversed for similar reasons." In rejecting Ainge's argument that the failure to instruct the jury on the jurisdictional element of the MDLEA tainted all of his convictions, the *Ainge* court stated:

> We reversed in *Medjuck* because the district court failed to instruct the jury to establish the statutory and constitutional jurisdictional requirements for conviction under the MDLEA by finding that the Lucky Star was a vessel subject to the jurisdiction of the United States, and that a sufficient nexus existed between the conduct condemned and the United States.

*Id.* The quoted language appears to suggest that the "constitutional jurisdictional requirements for conviction under the MDLEA" are requirements on which the jury should be instructed.[7] However, it is dicta. The issue of whether the constitutional question of nexus was a jury question did not play a role in

the Ninth Circuit's determination that errors in the jury instructions for the MDLEA counts did not taint the jury instructions regarding the other counts. Instead, the Ninth Circuit noted that "[t]he district court instructed the jury separately with respect to the other counts, which had no such peculiar independent jurisdictional requirement." *Id.*

Moreover, the parties in *Ainge* did not address the issue of whether the due process requirement is a question for the jury, nor did the *Ainge* court analyze that difficult question. Indeed Ainge did not complain to the Ninth Circuit that this Court failed to present the question of nexus to the jury. In fact, rather than asking for a jury determination of nexus, Ainge protested only that he "was deprived of any evidentiary hearing on nexus." Opening Brief at 12. The *Ainge* court's statement is dicta.

In addition to referring to *Medjuck*'s two holdings in dicta, it appears that both *Amparo* and *Ainge* have conflated those holdings. As stated above, a close reading of the *Medjuck* decision reveals two separate holdings. Because both holdings relate to jurisdictional requirements, albeit different jurisdictional requirements, it is apparent that a quick reading could merge the distinct analyses and conclusions. However, the Ninth Circuit separately considered and addressed the constitutional and statutory jurisdictional requirements of the MDLEA. The *Medjuck* court held that the statutory requirement that a vessel be "subject to the jurisdiction of the United States" was a jury question. *Medjuck*, 48 F.3d at 1110. It also separately held that the MDLEA has a constitutional requirement of nexus, which the government must prove in an evidentiary hearing. *Id.* at 1110–11. The *Medjuck* court did not hold that the due process question of nexus should have been submitted to the jury. *Id.*

The Court finds that these separate holdings have been inappropriately fused by the dicta statements in both *Ainge* and *Amparo*.

---

7. The Court notes in passing that this sentence is somewhat unclear. It may be suggesting that both the question of whether a vessel is "subject to the jurisdiction of the United States" and the question of nexus should be submitted to the jury. Alternately, it may be separating the two errors discussed in *Medjuck* because of the com-

ma separating the clause "by finding that the Lucky Star was a vessel subject to the jurisdiction of the United States" and the clause "and that a sufficient nexus existed between the conduct condemned and the United States." *Ainge*, slip op. at 2, 1996 WL 155137.

Neither court separately analyzed the two holdings and both inaccurately read *Medjuck* as holding that the jury should decide both the statutory and constitutional elements of jurisdiction. But based on its analyzes of *Medjuck* and of *Ainge* and *Amparo*, as well as of other authorities discussed in detail *infra*, the Court finds that these cases do not require it to present the constitutional due process question of nexus to the jury.

### 3. *MDLEA Authorities*

The Court next looks to whether other Ninth Circuit authority, or indeed any authority, requires the Court to submit the nexus issue to the jury. The parties have cited and the Court has located, no MDLEA case in which a jury, rather than the court, decides the issue of nexus.[8] Instead, it appears that the nexus question is routinely decided by courts rather than by juries.

For instance, in *United States v. Davis*, 905 F.2d 245 (9th Cir.1990), the defendant's motion to dismiss for lack of jurisdiction was denied. The Ninth Circuit affirmed, holding "[t]he facts *found by the district court* in denying Davis' motion to dismiss for lack of jurisdiction" were "sufficient to establish a nexus between the *Myth* and the United States." *Davis*, 905 F.2d at 249 (emphasis added). Similarly, the issue of nexus appears to have been decided by the trial courts in both *United States v. Aikens*, 685 F.Supp. 732 (D.Hawai'i 1988); on appeal *United States v. Aikins*, 946 F.2d 608 (9th Cir.1990), and *United States v. Peterson*, 812 F.2d 486 (9th Cir.1987). In *Aikins*, the issue was decided on a motion to suppress. *Aikens*, 685 F.Supp. at 741, *Aikins*, 946 F.2d at 611. Likewise, in *Peterson*, defendants moved to suppress evidence seized on the high seas. Following denial of their motion to suppress, the defendants entered conditional pleas of guilt and were convicted of conspiracy by the district court on stipulated facts. The Ninth Circuit affirmed, concluding that jurisdiction over the defendants was proper because there was "more than a sufficient nexus with the United States." *Peterson*, 812 F.2d at 493.

More recently, in *United States v. Khan*, 35 F.3d 426 (9th Cir.1994), the defendants[9] moved to dismiss arguing that the MDLEA as applied to them violated the Due Process Clause. The motion to dismiss was denied, and the defendants entered conditional pleas of guilt, reserving the right to challenge the jurisdictional issue. The district court found that there was a sufficient nexus, *United States v. Rasheed*, 802 F.Supp. 312 (D.Hawai'i 1992), and the Ninth Circuit affirmed. *Khan*, 35 F.3d 426. The *Khan* court nowhere suggested that the district court erred in deciding the motion to dismiss, or in failing to find that due process was a question for the jury.

Based on this authority, this Court finds that case law does not support turning the question of nexus over to the jury.

### 4. *Statutory Construction*

The Court next considers the MDLEA itself. Although the plain language of the statute itself does not contain a nexus requirement, the Ninth Circuit has imposed one in certain types of MDLEA prosecutions. *See, e.g., Davis*, 905 F.2d at 248–49 ("In order to apply extraterritorially, a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States so that application would not be arbitrary or fundamentally unfair."); *see also, Medjuck*, 48 F.3d at 1111; *Aikins*, 946 F.2d at 613.

Defendants argue that although nexus is not mentioned in the MDLEA, it should be considered an element of the offense, and therefore a question for the jury. They ar-

---

**8.** Medjuck cited *United States v. Ayarza–Garcia*, 819 F.2d 1043 (11th Cir.1987), arguing that the Eleventh Circuit held that the jurisdictional requirement of 21 U.S.C. § 955a (the predecessor to the MDLEA) was a question for a jury. However, the jurisdictional requirement referred to in that case was not the nexus requirement, but rather the statutory requirement that a vessel be "subject to the jurisdiction of the United States." *Id.* at 1048. *Ayarza–Garcia* did not address nexus and did not hold that the due process question was one for a jury.

**9.** The defendants in *Khan* are members of the same 70–ton Lucky Star hashish conspiracy at issue here.

gue that the term "a vessel subject to the jurisdiction of the United States" is subject to judicial gloss, and that such gloss includes the constitutional nexus requirement. In support, Medjuck cites *United States v. Nash,* 76 F.3d 282 (9th Cir.1996). In that case, the Ninth Circuit held that while 18 U.S.C. § 1014, which prohibits false statements to banks, does not expressly require such false statements to be material, materiality was an element of the offense which must be decided by the jury. *Id.* at 284. *See also, United States v. Gaudin,* — U.S. ——, ——, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995) ("materiality" is an element of the offense proscribed in 18 U.S.C. § 1001); *United States v. Nukida,* 8 F.3d 665 (9th Cir.1993) (holding the term "affecting interstate commerce" is an element of offense to be submitted to jury). Medjuck argues that similarly, although nexus is not expressly required by the MDLEA, it should be considered an element of the offense and therefore decided by the jury.

This argument fails as a matter of logic. The MDLEA provides that any one of the following types of vessels can be "a vessel subject to the jurisdiction of the United States": (A) "a vessel without nationality"; (B) "a vessel assimilated to a vessel without nationality" as defined in the 1958 Convention on the High Seas; (C) "a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States Law by the United States"; (D) "a vessel located within the customs waters of the United States"; or (E) "a vessel located in the territorial waters of another nation, where the nation consents to the enforcement of United States law by the United States." 46 U.S.C.App. § 1903(c)(1)(A)–(E). If nexus were a judicial gloss on the meaning of "a vessel subject to the jurisdiction of the United States," logic dictates that nexus would have to be shown in prosecutions involving each of the types of vessels enumerated in the MDLEA. However, this is not the case. In *United States v.*

*Juda,* 46 F.3d 961, 965 (9th Cir.1995), the Ninth Circuit held that nexus need not be shown with respect to a "vessel without nationality," 46 U.S.C.App. § 1903(c)(1)(A), that is, a stateless vessel. The *Juda* court found that "[n]either our court, nor any other circuit, however, has ever held that a nexus requirement is constitutionally required to support jurisdiction over a stateless vessel." *Juda,* 46 F.3d at 966–67. Recently, the Ninth Circuit observed that the MDLEA "extends the United States' jurisdiction over stateless vessels on the high seas without enumerating any further requirements, and particularly without requiring that there be a nexus between a defendant's conduct aboard a stateless vessel and the United States." *United States v. Caicedo,* 47 F.3d 370, 371 (9th Cir.1995).[10]

If nexus were a component of the jurisdictional element of the offense, it would of necessity have to be proved to the jury beyond a reasonable doubt in every MDLEA prosecution since all elements of an offense must be proved to the jury. *Gaudin,* — U.S. at ——, 115 S.Ct. at 2313. As an element of the offense, it would have to be proved in prosecutions involving stateless vessels as well as vessels in which the flag nation has consented to jurisdiction. There is no statutory or logical reason to find that nexus is an element in certain MDLEA prosecutions and not in others. Because nexus is not required in MDLEA prosecutions involving stateless vessels, it is *necessarily* not an element of the crime. Since nexus cannot be an element of the offense, the authorities cited by the defendants for the proposition that all elements of an offense must be provided to a jury beyond a reasonable doubt are therefore inapposite. *See, e.g., Gaudin,* —— U.S. at ——, 115 S.Ct. at 2313; *Nash,* 76 F.3d at 284; *Nukida,* 8 F.3d at 672. The Court thus finds that the MDLEA does not require that nexus be proved to the jury.

### 5. *Analogous Questions*

Having looked to the MDLEA and cases interpreting it, the Court now analyzes

---

**10.** The reason for requiring nexus in prosecutions involving flagged vessels and not in those involving stateless vessels is "grounded on the international law principles applicable to foreign flag vessels." *Caicedo,* 47 F.3d at 372. "Be-

cause stateless vessels do not fall within the veil of another sovereign's territorial protection, all nations can treat them as their own territory and subject them to their laws." *Id.* at 373.

whether constitutional questions, including ones of due process, are generally jury questions in similar circumstances.

Courts have held that constitutional questions that are unrelated to guilt or innocence are to be resolved by the court rather than by the jury. Learned author Charles Wright noted that there is little case law on this issue, but that "what there is distinguishes between the issue of guilt and innocence, for which a jury is required, and issues affecting the government's right to prosecute, for which no jury is needed." 1 Wright, *Federal Practice and Procedure: Criminal 2d* § 194 (1982). Courts have found that challenges to the institution of a prosecution are appropriately directed to the trial court, and not the jury. For example, in *United States v. Mac-Dougall*, 790 F.2d 1135, 1141 (4th Cir.1986), the Fourth Circuit considered whether a prosecution violated the Fifth Amendment's bar on double jeopardy. In deciding that the matter was one for the court, the *MacDougall* court held that a double jeopardy challenge does not go to guilt or innocence, but instead goes to "the right of the government to bring the action itself." *Id.* at 1141. *MacDougall* committed the double jeopardy question to the court rather than a jury, determining, "[t]he appellants' double jeopardy claims did not implicate the issue of appellants' guilt or innocence, which a jury must decide, but rather the right of the government to bring the action itself. Guilt or innocence is immaterial to the disposition of double jeopardy claims." *Id.* Similarly, in *United States v. Berrigan*, 482 F.2d 171 (3d Cir.1973), defendants challenged their prosecution as discriminatory in violation of the Equal Protection Clause. The Third Circuit held that "[t]he question of discriminatory prosecution relates not to the guilt or innocence of appellants, but rather addresses itself to a constitutional defect in the institution of the prosecution." *Id.* at 175. The *Berrigan* court held that this constitutional question is one for the court and not the jury. *Id.*

In other circumstances, constitutional questions are also resolved by trial courts rather than juries. For example, it is well settled that a court and not a jury determines the constitutional question of whether a confession is voluntary or not. *United States v. Raddatz*, 447 U.S. 667, 678, 100 S.Ct. 2406, 2413–14, 65 L.Ed.2d 424 (1980); *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Answering this question does "not coincide with the criminal law objective of determining guilt or innocence." *Raddatz*, 447 U.S. at 678, 100 S.Ct. at 2413. In determining the voluntariness of a confession, the trial court holds a hearing. While the issue in a suppression hearing is in part evidentiary, and therefore a question for the court pursuant to Federal Rule of Evidence 104(a), it is also a constitutional question and equally directed to the court. *Id.* at 678 n. 4, 100 S.Ct. at 2413 n. 4.

Similarly, due process rights are decided by the court in a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In a *Kastigar* hearing, the court determines whether the government has borne its burden of showing that evidence used against a witness who has given compelled testimony is not derived from that compelled testimony. *Id.* This due process question, which does not involve matters of guilt or innocence, is a question for the court. *Id.*

Likewise, the issue of government misconduct is one for the court rather than a jury. Government misconduct cases present the question of whether "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973).[11] The "defense" of governmental misconduct is a question for the court. *See, e.g., United States v. Bogart*, 783 F.2d 1428 (9th Cir.1986), vacated only as to separate defendant in *United States v. Wingender*, 790 F.2d 802 (9th Cir.1986). However, "[a]lthough outrageous governmen-

---

11. Outrageous government conduct is that which is violative of " 'fundamental fairness, shocking to the universal sense of justice' mandated by the Due Process Clause of the Fifth Amendment." *Russell*, 411 U.S. at 432, 93 S.Ct. at 1643 (citation omitted).

tal conduct is sometimes referred to as a 'defense,' it is not an affirmative defense to entrapment. Rather, this 'defense' is merely a claim that the government's conduct was so outrageous that due process principles require dismissal of the indictment." *United States v. Slaughter*, 891 F.2d 691, 695 (9th Cir.1989). In such cases, the trial court holds an evidentiary hearing on the "jurisdictional challenge" to the prosecution. *United States v. Matta–Ballesteros*, 71 F.3d 754, 764 (9th Cir.1995) (trial court held limited evidentiary hearing on defendant's "jurisdictional challenge" based on claim that he was tortured by government agents); *Bogart*, 783 F.2d at 1432 (matter remanded for trial court's findings of fact on due process challenge of outrageous government conduct). *See also, Slaughter*, 891 F.2d at 696 (trial court held evidentiary hearing on issue of outrageous government conduct).

Defendant Medjuck argued at oral argument (but not in any of his briefs) that the question of nexus is analogous to entrapment, which is a question for the jury and not the court. *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). The Court disagrees. The Supreme Court has held that "the issue whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused." *Sherman v. United States*, 356 U.S. 369, 377, 78 S.Ct. 819, 823, 2 L.Ed.2d 848 (1958) (footnote omitted). However, as just discussed, questions relating to guilt or innocence go to the jury; constitutional questions do not. The nexus question, like inquiries into outrageous government conduct or double jeopardy or discriminatory prosecution (but unlike entrapment), does not ask whether the defendant had the mens rea and actus reus necessary for committing the crime alleged, or whether the government can prove all the elements of the offense beyond a reasonable doubt. Instead, nexus is simply a question of whether the United States can, consistent with principles of due process, reach out and prosecute these defendants. *Medjuck*, 48 F.3d at 1111. Nexus is not a question of guilt or innocence. Therefore, it is a question for the court and not a jury.[12]

### 6. *Nexus Is A Court Question*

To summarize the preceding discussion, in *Medjuck*, the Ninth Circuit explicitly held that whether a ship was "a vessel subject to the jurisdiction of the United States" was a question for the jury; it did not so hold for the question of nexus, which was the subject of a separate holding. *See* Section II.A.1., *supra*. In no other MDLEA case has nexus been submitted to the jury. *See* Section II.A.3, *supra*. The references to jury determination of nexus are simply dicta in both *Amparo* and *Ainge* and are based on an imprecise reading of *Medjuck*. *See* Section II.A.2., *supra*. In addition, the MDLEA does not make jurisdiction an element of the offense, and there is no justification for requiring nexus as an element when jurisdiction is conferred because a flag nation has consented, but not when jurisdiction results because the vessel is stateless. *See* Section II.A.4, *supra*. Finally, nexus, like other due process and constitutional questions, is not a question of guilt or innocence, and therefore is not the kind of question that goes to the jury. *See* Section II.A.5, *supra*. The Court accordingly concludes that nexus is a question for it rather than a jury.

### B. *Burden of Proof*

■ The Court next determines the applicable burden of proof. The government argues its burden is one of the preponderance of the evidence; the defendants seek proof either beyond a reasonable doubt or by clear and convincing evidence. While no case has directly addressed this question, the weight of authority sustains a finding that the burden of proof is a preponderance of the evidence.

As an initial matter, because the Court has determined that nexus is a question for it

---

12. The fact that a decision regarding nexus requires credibility assessments and the weighing of evidence does not mean that it should be done by a jury and not a court. For example, the resolution of a suppression motion often requires making credibility determinations and weighing evidence, *see, e.g., Raddatz*, 447 U.S. at 678, 100 S.Ct. at 2413–14, as does the question of outrageous government conduct, *see, e.g., Matta–Ballesteros*, 71 F.3d at 764.

rather than for the jury, and that nexus is not an element of the crime, there is little support for a standard of proof beyond a reasonable doubt.

Additionally, courts which have reviewed nexus appear to have applied a preponderance of the evidence standard. For example, in *Davis*, the Ninth Circuit held that evidence that the vessel was 35 miles from and headed toward San Francisco when first detected, that it was many miles from the standard route to Acapulco, that it was on the list of suspected drug-smuggling boats, and that it was unusual for a boat of its size to have sailed from Hong Kong, was "sufficient to establish a nexus" between the ship and the United States. *Davis*, 905 F.2d at 249. Similarly, in *Peterson*, the Ninth Circuit found there was "substantial evidence" in support of nexus. *Peterson* 812 F.2d at 493. In *Khan*, the Ninth Circuit held that the facts found by the district court "support a holding that there was a sufficient nexus between the LUCKY STAR and the United States." *Khan*, 35 F.3d at 429. The *Khan* court specifically held that the defendants' argument that "the evidence relied upon by the district court is not determinative because contrary evidence exists.... is of no avail." *Id.* at 430. Though none of these cases specifically hold that the correct standard is a preponderance of the evidence, they cannot be read to require proof beyond a reasonable doubt, or even proof by clear and convincing evidence.

Finally, in circumstances in which resolution of a constitutional question "has nothing whatever to do with improving the reliability of jury verdicts," *Lego v. Twomey*, 404 U.S. at 486, 92 S.Ct. at 625, the Supreme Court has held that proof by a preponderance of the evidence is sufficient. In *Lego*, the Supreme Court held that proof that a confession was voluntary could be made by a *preponderance of the evidence*, rather than beyond a reasonable doubt, because the resolution of the question did not affect the reliability of a guilty verdict, nor was the voluntariness of the confession an element of the offense. *Id.* at 487, 92 S.Ct. at 625–26. *See also*, Section II.A.5, *supra*. Similarly, the Ninth Circuit has held that

the government may meet its *Kastigar* burden by a preponderance of the evidence. *United States v. Rogers*, 722 F.2d 557, 560 (9th Cir.1983); *United States v. Contreras*, 755 F.2d 733, 735 (9th Cir.1985). The question of nexus, like the questions raised in *Lego* and *Kastigar*, does not affect the reliability of a verdict, nor does it relate to the issues of guilt or innocence. Instead, it goes to the constitutional propriety of the prosecution. For these reasons, the Court finds that the appropriate evidentiary standard is proof by a preponderance of the evidence.

## C. Destination and Nexus

### 1. Case Law

■ The Court now turns to what constitutes a showing of nexus, and whether nexus requires that the drugs be destined for the United States.

The Ninth Circuit has employed a flexible standard for determining whether nexus exists such that prosecution of a particular defendant does not violate due process. Courts have focused on the "ultimate question" of nexus: "would application of the statute to the defendant be arbitrary or fundamentally unfair." *Davis*, 905 F.2d at 249 n. 2. For instance, the *Peterson* court looked to whether the "attempted transaction is aimed at causing criminal acts within the United States." 812 F.2d at 493. *See also*, *Davis*, 905 F.2d at 249. In *Aikins*, the Ninth Circuit held that "[d]ue process is not offended by the extent of the jurisdiction created if there is a sufficient nexus between the conduct condemned and the United States." *Aikins*, 946 F.2d at 613. In *Khan*, the court held that "[t]o meet the nexus requirement, the government must show that the plan for shipping the drugs was likely to have effects in the United States." *Khan*, 35 F.3d at 429. While the Ninth Circuit has not determined whether a "minimal contacts" test satisfies the due process nexus requirement, *see Juda*, 46 F.3d at 966, it is clear that due process is satisfied "as long as there is a sufficient nexus between the conduct condemned and the United States." *Medjuck*, 48 F.3d at 1111.

To date, the Ninth Circuit has not announced an explicit definition of nexus. In particular, the Ninth Circuit has firmly resisted defining nexus as a showing of United States destination, despite several opportunities to do so and despite the urging of the defendants. *See, e.g., Davis,* 905 F.2d 245; *Peterson,* 812 F.2d 486; *Aikins,* 946 F.2d 608; *Khan,* 35 F.3d 426; *Medjuck,* 48 F.3d 1107.

Defendants vigorously argue that a showing of nexus requires the government to establish that the drugs were ultimately bound for the United States. This Court disagrees. It is true that in a number of cases, nexus has been demonstrated by a showing that the drugs were destined for the United States. For example, in *Aikins,* the court held that "a sufficient nexus exists where the ship with drugs is bound ultimately for the United States." *Aikins,* 946 F.2d at 613–14. *See also, Peterson,* 812 F.2d at 493 (nexus was shown when there was "substantial evidence that the drugs were bound ultimately for the United States.") In *Davis,* the court examined a number of factors in determining that nexus had been demonstrated, including the location and probable destination of the boat, as well as evidence supporting the conclusion that it was a drug-smuggling ship. *Davis,* 905 F.2d at 249.

However, while it is clear that a United States destination is sufficient to show nexus, it is not necessary for a nexus showing. In *Khan,* the district court looked at a number of factors in finding nexus, including the fact that Americans controlled the movements of the Lucky Star, the conspiracy was coordinated and controlled in the United States, the Lucky Star had backup landing sites in the United States, and that the conspirators' plan called for ultimate distribution in the United States. *Khan,* 35 F.3d at 429. The Ninth Circuit found the most important of these factors were the plan to transport the drugs to the United States, and the backup plan to land in Alaska or California. *Id.* However, *Khan* did not specifically hold that United States destination was required in

order to allow the government to exercise jurisdiction, and this Court does not so hold. As this case amply demonstrates, as discussed in greater detail below, a sufficient connection between the United States and criminal conduct can be shown even when the facts demonstrate that the illegal drugs are bound for some country other than the United States.

### 2. *Legislative History*

Defendant Medjuck argues that the legislative history of 21 U.S.C. § 955a [13] supports his argument that nexus requires United States destination. As the Ninth Circuit has held, "resort to legislative history is not necessary when the language of the statute is unambiguous." *Straub v. AP Green, Inc.,* 38 F.3d 448, 454 (9th Cir.1994) (citation omitted). *See also, Export Group v. Reef Industries, Inc.,* 54 F.3d 1466, 1475 n. 9 (9th Cir. 1995). The Court should not "resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994). Here, the statute is unambiguous in not requiring United States destination. However, the Ninth Circuit has also held that legislative history may be consulted "to the extent it is of value, to aid in [the court's] interpretation," *Export Group,* 54 F.3d at 1475 n. 9, when a party offers a plausible interpretation of a statute.

Here, the Court finds that the legislative history is of little value in determining whether nexus requires United States destination because the statute is clear and because conflicting inferences can be drawn from the legislative history. Nonetheless, it discusses the legislative history raised by the parties.

In support of his position that nexus requires United States destination, Medjuck cites a letter from Assistant Attorney General Patricia M. Wald, *reprinted in* H.R.Rep. No. 323, 96th Cong., 1st Sess. at 16 (1979), *quoted in United States v. James–Robinson,*

---

**13.** Title 21 U.S.C. § 955a is the predecessor statute to 46 U.S.C.App. § 1903. Section 955a(a) makes it unlawful for persons aboard vessels subject to the jurisdiction of the United States to possess a controlled substance. Section 955b(d) defines a vessel subject to the jurisdiction of the United States as a stateless vessel.

515 F.Supp. 1340, 1343 (S.D.Fla.1981). That letter states that in order to exercise jurisdiction, "the United States *must show an actual or potential adverse effect within its territory.* It is doubtful that such an adverse effect could be demonstrated in the absence of intent to import the substance into the United States or knowledge that it will be imported." *Id.* (emphasis in original). However, this letter is not determinative. As the *James–Robinson* court noted, the Department of Justice opposed § 955a on the grounds that "it was doubtful the U.S. would have jurisdiction where no adverse effect on the country was required." *Id.* While the Justice Department sought an amendment requiring "that a defendant have the knowledge or intent that the controlled substances would be imported into the United States," no such amendment was enacted. *Id.*

In addition, other legislative history suggests that § 955a specifically did not require United States destination. In *United States v. Howard–Arias,* 679 F.2d 363 (4th Cir. 1982), the Fourth Circuit looked to the legislative history of § 955a and concluded that there need be no showing of intent to distribute in the United States. *Id.* at 370–71. Chairman Murphy, the Chairman of the House Committee on Merchant Marine and Fisheries stated: "[t]he intent to distribute need not be within the United States.... *Under [§ 955a], it would not be necessary to prove that the vessel or the controlled substance was bound for the United States.*" H.R.Rep. No. 323, 96th Cong., 1st Sess. at 7–12 (1979), quoted in *Howard–Arias,* 679 F.2d at 371 (emphasis added in *Howard–Arias* ). In addition, Congressman McCloskey, the ranking minority member of the Committee, said: "[w]here current law requires an intent to import a controlled substance into the United States as a necessary element of the crime *this bill essentially requires only knowledge or intent to distribute with no need to establish a U.S. destination.*" 125 Cong.Rec. H 6380 (July 23, 1979), quoted in *Howard–Arias,* 679 F.2d at 371 (emphasis added in *Howard–Arias* ). Thus, legislative history can be found in support of the argument that § 955a does not require United States destination.

Ultimately, however, the Court finds that the legislative history of 18 U.S.C. § 955a does not answer the question of whether United States destination is required. Section 955b defines vessels subject to the jurisdiction of the United States as stateless vessels; 46 U.S.C.App. § 1903 expands the definition to include, *inter alia,* flagged vessels whose flag nations consent to jurisdiction. The Ninth Circuit has held that due process requires a showing of nexus with respect to flagged vessels but not with respect to stateless vessels. *Compare Medjuck,* 48 F.3d at 1111, with *Juda,* 46 F.3d at 966–67. Thus, the legislative history of § 955a does not shed much light on whether nexus requires a showing of United States destination.

Neither party has briefed the legislative history of 46 U.S.C.App. § 1903. However, the Court's research suggests that Congress did not intend to require United States destination. When the section was first enacted, vessels "subject to the jurisdiction of the United States" were defined as including only stateless vessels. Pub. Law 96–350 § 2(d). The Senate Report on the legislation states that "[a]ccording to the Coast Guard, most of its difficulties in drug enforcement stem from this statutory void which does not proscribe possession of controlled substances on the high seas, while such conduct is a crime in U.S. territory." S.Rep. No. 855, *reprinted in* 1980 U.S.C.C.A.N. 2785. It makes no mention of United States destination. The statute was amended in 1986 "because defendants in cases involving foreign stateless vessel boardings and seizures have been relying heavily on international jurisdictional questions as legal technicalities to escape conviction." S.Rep. No. 530, *reprinted in* 1986 U.S.C.C.A.N. 6000. In the 1986 amendment, "a vessel subject to the jurisdiction of the United States" was defined to include foreign flagged ships whose flag nations give consent to jurisdiction. Pub. Law 99–640 § 17, 100 Stat 3553. The Senate Report to that statutory change states that this amendment "spells out in greater detail the kinds of situations subject to U.S. enforcement jurisdiction." S.Rep. 530, *reprinted in* 1986 U.S.C.C.A.N. 6001. The Report again says nothing about United States desti-

nation. *Id.* The Court thus finds that the legislative history of the MDLEA does not suggest that United States destination is required.

### D. *Definition Of Nexus*

Although nexus does not require United States destination, it does demand some connection between the defendants and the United States. As noted above, the Ninth Circuit has not explicitly defined nexus and has instead used a flexible standard. But to the extent that nexus must be defined, the Court finds the most useful description is the one that appeared in *Caicedo,* 47 F.3d 370. Although *Caicedo* held that a showing of nexus was not required in cases involving stateless vessels, the court reviewed the nexus requirement:

> A nexus requirement, imposed as a matter of due process, makes sense when the "rough guide" of international law also requires a nexus. A defendant would have a legitimate expectation that because he has subjected himself to the laws of one nation, other nations will not be entitled to exercise jurisdiction without some nexus. Punishing crimes committed on a foreign flag ship is like punishing a crime committed on foreign soil; it is an intrusion into the sovereign territory of another nation. As a matter of comity and fairness, such an intrusion should not be undertaken absent proof that there is a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests.

*Caicedo,* 47 F.3d at 372. The Court will apply the *Caicedo* definition of nexus: "a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests." *Id.* This definition comports with the notion that due process is a "flexible concept," *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), and highlights the "ultimate question" of fairness. *Davis,* 905 F.2d at 249 n. 2. It also incorporates the nexus standards set forth in a number of MDLEA cases. For instance, in *Aikins,* the court held that "[d]ue process is not offended by the extent of the jurisdiction created if

there is a sufficient nexus between the conduct condemned and the United States." *Aikins,* 946 F.2d at 613. *See also, Medjuck,* 48 F.3d at 1111 (same). The *Peterson* court held "[w]here an attempted transaction is aimed at causing criminal acts within the United States, there is a sufficient basis for the United States to exercise its jurisdiction." *Peterson,* 812 F.2d at 493. The *Davis* court pursued the same inquiry, concentrating on the question of whether application of the MDLEA would be "arbitrary or fundamentally unfair." *Davis,* 905 F.2d at 249.

In *Khan,* the Ninth Circuit held that in order to show nexus, "the government must show that the plan for shipping the drugs was likely to have effects in the United States." *Khan,* 35 F.3d at 429. The *Caicedo* definition, which is more flexible, encompasses this requirement but focuses more directly on the "ultimate question" of whether prosecution would be "arbitrary or fundamentally unfair." *Davis,* 905 F.2d at 249 n. 2. The Court will therefore apply the *Caicedo*'s definition rather than *Khan*'s.

To summarize the Court's legal conclusions, the Court has determined that nexus is a question for the Court rather than the jury. Nexus is defined as "a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests." Finally, the government has the burden of demonstrating nexus by a preponderance of the evidence. Having made those legal findings, the Court now turns to a review of the facts in this case to determine whether nexus has been shown as to defendants Medjuck and Sotirkys.

### III. FACTUAL FINDINGS

The Court held a three-day evidentiary hearing at which the following witnesses testified: Customs Agent Brian Rockom, Customs Agent Laurence Michael Gallion, Customs Agent Paul DeCotiis, FBI Special Agent Peter Won, Royal Mounted Canadian Police ("RCMP") Sergeant Jean Martin, Michael Fernando, Dennis Feroce, and Mazsen

Alchawa.[14] In addition, transcripts of recorded conversations were admitted, along with other documents.

In this section, the Court sets forth the facts demonstrated at the nexus hearing. The factual findings require a detailed and somewhat lengthy discussion of the details of the conspiracy, which spanned several years and involved a large group of people in different countries throughout the world.[15]

### A. The Conspirators

The story of the maritime drug conspiracy begins in Singapore 1990 with an agreement between nationals of several different countries to transport a load of hashish from Karachi, Pakistan to North America. The conspirators planned to transport the hashish across the Pacific Ocean in a large vessel which was to be met by a smaller boat in international waters. The hashish was to be transferred from the large boat to the smaller vessel, taken to shore in North America and then trucked inland. The exact destination of the hashish is a matter of some dispute.

A number of the conspirators were based in Singapore. Haji Ibrahim was the Pakistani hashish supplier responsible for providing the hashish for the venture. Ferdous, also from Pakistan, assisted and translated for Haji. Razak, (aka "Sunesra") was an associate of Haji and Ferdous. Michael Fernando, and his partner Captain Malapit (aka "Boots") were hired to procure and outfit a ship to be used to transport the hashish. The hashish was purchased by Norbert Stok and Leo Hartong, both Dutch. Richard Ezidro, an American citizen, was their partner. Ezidro's associate, Charlie Sotirkys, an American living in Singapore, was responsible for shore-based communications with the transport vessel. David McNelly, also an American, was hired to escort and guard the hashish on the vessel and to provide communications from the vessel. The cast later expanded to include another individual named Razak[16] who was the owner of the Lucky Star, the second vessel used in the venture, and Captain Rasheed.

The North American side of the conspiracy was also large. Michael Medjuck, a Canadian, who was an associate of Ezidro, purchased the hashish. He was responsible for bringing it to shore and transporting it inland when it reached North America. Medjuck employed Dennis Feroce, an American citizen who lived in Vancouver, and Jack Hayden, also an American citizen, to hire an offload boat crew. Medjuck also hired Larry Stanley, Barry Shantz, and Ray Ainge to assist in the venture.[17] Stanley and Ainge are American citizens, and Shantz is Canadian.

Medjuck, through Feroce, hired Americans Brian Rockom and Michael Gallion and their tuna fishing vessel the Barbara H. to meet the hashish-laden mothership in the middle of the Pacific Ocean. Paul DeCotiis (aka "Ron"), also an American, was responsible for shore-to-ship communications.

### B. The Saratoga Success And The Lucky Star

The cast of characters now set, the Court turns to the venture itself. The story of the hashish's journey from Pakistan to the middle of the Pacific Ocean comes mainly from the testimony of Michael Fernando at the nexus hearing.[18]

---

**14.** Mr. Alchawa testified at the 1993 Sotirkys trial and his trial testimony was submitted by consent of the parties in lieu of his appearance.

**15.** In its discussion of this conspiracy, the Court is mindful that defendant Sotirkys has not yet been retried.

**16.** Two persons named Razak were involved in the conspiracy. The first Razak, also known as Sunesra, was associated with the sellers of the hashish. He will be referred to as Razak–Sunesra. The second Razak owned the Lucky Star. He will be referred to as ship-owner Razak.

**17.** Still other Canadians were hired to assist in the inland transportation of the hashish, but these individuals are not relevant to the nexus inquiry.

**18.** While Fernando testified at both the nexus hearing and the trial, the Court considers only his nexus hearing testimony against Sotirkys. Although the trial testimony did not vary significantly from the nexus hearing testimony, defendant Sotirkys was not present at the trial and was unable to cross-examine Fernando's trial testimony. However, the testimony in both pro-

Fernando and Malapit attended several meetings in Singapore in 1990 with Stok, Hartong, Razak–Sunesra and Haji. Stok and Hartong hired Fernando and Malapit to procure a shipping vessel to be used to transport the hashish. Fernando and Malapit purchased the Imran Success, later renamed the Saratoga Success, for the venture. As part of the agreement, they equipped it with navigational and communications equipment that would allow ship-to-ship communications as well as communications between ship and shore.

Throughout the early part of 1990, the conspirators met repeatedly in Singapore to discuss the logistics of their smuggling plans. In addition to meeting with other participants, Fernando met with defendant Sotirkys along with McNelly and Ezidro. Ezidro ran a number of these meetings.

In June of 1990, Captain Malapit traveled to Pakistan to pick up the drugs. Loaded with twenty-some tons of hashish, the Saratoga Success began its journey to North America. David McNelly was aboard both as an escort for the cargo and as a radio operator. Sotirkys stayed in Singapore where he continued to meet with the other conspirators.

The Saratoga Success did not live up to its name. First, the vessel developed engine trouble while in international waters near Singapore. While it was being fixed, a tanker rammed into it, necessitating more repairs. The ship was mended by late August of 1990 and resumed its voyage. Shortly thereafter, it was hit and damaged by a typhoon. The vessel was taken to Manila where it was again repaired. Again the Saratoga Success resumed its voyage, only to be hit by another typhoon off the Philippine Islands. Efforts to refloat it were unsuccess-ful, and the craft, still containing its load of hashish, was grounded in the Philippines.

During the course of the Saratoga Success's ill-fated efforts to cross the ocean, the Singapore-based conspirators met repeatedly in efforts to resolve the problems with the vessel. Defendant Sotirkys was at these meetings and participated in the discussions and planning. Eventually, the conspirators abandoned their efforts to use the Saratoga Success and procured a new vessel. They enlisted the Lucky Star, owned by ship-owner Razak, and mastered by Captain Rasheed. The Lucky Star was a 350–foot freighter flying the flag of St. Vincent.

The conspirators then began their efforts to equip and load their new ship. Sotirkys outfitted the Lucky Star with various communications devices and made arrangements for communications between the freighter and the conspirators on shore. Once the Lucky Star was outfitted, Sotirkys and McNelly sailed aboard it to Karachi, Pakistan. There, the Lucky Star picked up an additional forty-plus tons of hashish.[19] Once the Lucky Star was loaded, Sotirkys left Karachi and returned to Singapore. The Lucky Star traveled to Manila, where the Saratoga Success was grounded, and picked up the Saratoga Success' load of hashish. Then loaded with 70 tons of hashish, the Lucky Star continued its westward ocean journey with McNelly once again on board as an escort and radio operator. Thereafter, Sotirkys left Singapore and returned to the United States.

### C. *The North American Conspiracy*

While Sotirkys and the Singapore-based conspirators were attempting to transport the hashish across the ocean, plans were being made in North America to receive the load. This part of the story comes from the

ceedings can be considered with respect to Medjuck.

In reviewing Fernando's testimony, the Court is mindful that Fernando has not been charged in either the United States or Singapore. The Court is also aware that his participation in the events that he describes could expose Fernando to death by hanging in Singapore and to 30 years incarceration in the United States, and that Fernando has significant motivation to avoid prose-cution. Nonetheless, having had an opportunity to see Fernando's demeanor while testifying and under cross-examination, the Court has found Fernando's testimony credible.

**19.** The hashish was transported on the backs of 300 camels to the coast of western Pakistan by 100 men, including 20 men armed with machine guns, rocket launchers, and shotguns. It was then taken to the Lucky Star via skiffs.

testimony of Dennis Feroce,[20] as well as the testimony of the three undercover agents. These witnesses testified at both the nexus hearing and the trial.[21]

In December of 1990, Feroce was approached by his long-time friend Michael Medjuck, who asked him if he would be interested in assisting in an offload of hashish. By January or February of 1991, Medjuck hired Feroce, along with Feroce's friend Jack Hayden, to find and hire an offload vessel and crew. They were looking for a boat that would meet the Lucky Star in international waters sometime in June of 1991, offload the multi-ton load of hashish, and transport it to British Columbia. Hayden initially traveled to Oregon in search of a boat and crew, but his search did not bear fruit. In March or April of 1991, a friend of Hayden's named Michael Culbertson told Hayden he knew of a boat and crew in Hawaii that might be able to do the offload. When Feroce told Medjuck about this lead, Medjuck instructed Feroce to go to Hawaii to talk to the potential boat crew.

In early May of 1991, Feroce and Hayden drove to Portland and there met with co-conspirator Larry Stanley to discuss the venture. From there, the three traveled to Hawaii (using expense money Medjuck gave Feroce) to meet with the crew Culbertson told them about. On May 8 and 9, Feroce, Hayden and Stanley met with Brian Rockom and Michael Gallion. Unbeknownst to Feroce and his confederates, Culbertson was a government informant, and Rockom and Gallion were United States Customs agents. Rockom posed as the captain of the Barbara H. and Gallion posed as his partner.

The conspirators and government agents met in Hawaii three times between May 8 and 9 to confer about the smuggle. During these meetings, they discussed whether Rockom and Gallion would be willing to take the Barbara H. out on the high seas, meet with the Lucky Star (which they referred to as the mothership), offload the hashish, and transport the hashish to the Queen Charlotte Islands on the West Coast of British Columbia. In return for their efforts, Rockom and Gallion would be paid $3 million dollars in U.S. currency. Feroce discussed possible points at which the Barbara H. could meet with the mothership as well as radio frequencies to be used in communications. They also talked, in general terms, about the possibility of having alternate landing sites "down south." The alternate landing sites suggested by the agents were in Alaska and California. They also talked about the fact that the people who would be offloading the hashish were "all Yanks" who would travel to Canada for the job and then return to the United States so that they could not be identified or arrested in Canada.

Feroce and Hayden told Rockom and Gallion that they had been to Oregon to meet with another crew. However, Feroce said that he would recommend the undercover agents to his boss, referred to as "Mr. M." [22] Feroce told Rockom and Gallion that he was

---

**20.** In considering Feroce's testimony, the Court has taken into account that Feroce was charged in the conspiracy and faced a possible sentence of 30 years. Feroce cooperated with the government and entered a guilty plea. In return for his testimony, the government recommended a sentence of 5 years, and this Court sentenced him to 4 years. The Court is also aware that Feroce has received and hopes to continue to receive various benefits from the government in return for his testimony. The Court has observed his demeanor while testifying and finds that Feroce's testimony regarding Medjuck's role in the 3 MDLEA counts was credible and corroborated by the other evidence.

**21.** Once again, because Sotirkys was not present at the trial, only the nexus hearing testimony of these witnesses will be considered with respect

to him. However, because Medjuck was present at both the nexus hearing and the trial and the opportunity to cross-examine Feroce and the agents at both proceedings, their testimony in both can be considered with respect to Medjuck.

**22.** In recorded conversations with the agents, Feroce described Mr. M. as a South African businessman and restaurateur living in British Columbia. Feroce said that his girlfriend and Mr. M's wife were close friends, that Mr. M. had two children and was an avid golfer. Michael Medjuck, who spent his formative years in South Africa, is a businessman and restaurateur then living in Vancouver, British Columbia. His wife attended high school with Feroce's girlfriend. Medjuck has two children and is an avid golfer. This evidence corroborates Feroce's testimony that Medjuck was his boss.

confident that Mr. M. would hire Rockom and Gallion to perform the offload.

Before his return to Canada and while still in Hawaii, Feroce telephoned Medjuck in Vancouver. When Feroce returned to Canada he met with Medjuck and was introduced to Ezidro. The three talked about Feroce's meeting with Rockom and Gallion, and Feroce gave Ezidro the coordinates and radio frequencies he had worked out with the undercover agents for the offload. They also discussed the arrangements for paying Rockom and Gallion some front money. At the meeting, Medjuck and Ezidro told Feroce to hire Rockom and his crew.

Feroce met with Rockom twice in May in order to pay him and to discuss the venture. Both meetings took place in the United States. At both meetings, Feroce paid Rockom with cash, including U.S. currency. Prior to Feroce's meeting with Rockom, Medjuck arranged for a courier to meet Feroce in Seattle, Washington, in order to give him U.S. currency with which to pay Rockom. Medjuck did at least part of the arranging from Pebble Beach, California.

Feroce and Rockom first met in Washington at the Seattle–Tacoma Airport. At that meeting, which was recorded, Feroce gave Rockom $45,000 in U.S. currency and the two discussed various logistics, including the date of the rendezvous with the mothership, the proposed route for the hashish, communication frequencies, and other details of the smuggle. *See* Nexus Ex. (hereinafter "N–") 7.

The second meeting occurred on May 22, 1991 in Port Townsend, Washington.[23]

Rockom and Feroce again discussed details of the offload, including communication frequencies, call signs for the vessels, and the route to the Queen Charlotte Islands. They agreed that communications were to be handled by "Ron," a California-based associate of Rockom and Gallion who was said to have sophisticated communications equipment that would allow him to communicate with the Barbara H. while she was at sea. Again unbeknownst to Feroce and the other conspirators, Ron was actually undercover Customs Agent Paul DeCotiis.

Following his May 22 meeting with Rockom, Feroce returned to Vancouver and met with Medjuck and Ezidro to discuss the operation. Medjuck told Feroce that the mothership was delayed by a storm and would not be able to meet the offload vessel at the prearranged time. Feroce drove back to Seattle in an unsuccessful effort to meet Rockom in person before Rockom departed.

On June 5, 1991, Agents Rockom, Gallion, and their crew left Hawaii aboard the Barbara H.[24] Between June 5 and approximately June 18, 1991, Feroce had a number of telephone conversations with Agent DeCotiis, most of which were recorded. DeCotiis was in the San Francisco Bay Area during all these telephone calls. Feroce and DeCotiis discussed many of the details of the smuggle, including codes, frequencies, locations for the offload, and the mothership's delay. DeCotiis also had a telephone conversation with Medjuck during this time period. On June 6, 1991, DeCotiis paged Medjuck, who then returned the page. In the unrecorded conversation, DeCotiis and Medjuck discussed frequencies and codes.[25] Later that day, De-

**23.** This meeting was not recorded.

**24.** The Barbara H. was a vessel registered in the United States. Its home port of San Diego was marked on its stern.

**25.** Although this phone call was unrecorded and the contemporaneous nature of DeCotiis' notes was called into question upon cross-examination, the telephone conversation was corroborated by a taped conversation between Feroce and DeCotiis later the same day in which Feroce said that Medjuck had mentioned to him the conversation between DeCotiis and Medjuck. Trial Ex. 111D.

This June 6 conversation was one of only two conversations the undercover agents had with

Medjuck. The first, which was recorded, occurred on May 28. DeCotiis and Gallion, who were then in San Francisco, were trying to reach Feroce. They paged a number with a Toronto area code at which Feroce said he could be reached. Medjuck eventually answered the page and told the agents that they had the wrong number; there was no Dennis there. *See* N–30. The next day, Feroce told DeCotiis that he had talked to Medjuck who was not expecting the page and did not realize who DeCotiis was. Feroce explained that the pager was Medjuck's, and that the undercover agents could use it in order to contact Feroce if there was a "major necessity to get a hold of [him]." N–30. *See also,* N–13.

Cotiis and Feroce spoke about codes and frequencies, as well as other logistics. Trial Ex. 111D.

In all of the telephone conversations with the undercover agents, at least one speaker was in the United States, and this fact was known to the conspirators. More often, both participants were in this country. In fact, Feroce was in the United States during nearly all of the telephone conversations he had with the undercover agents. Rockom testified that Feroce told him that Feroce:

> would always try to make phone calls from the United States because he was concerned about electronic interception by the Royal Canadian Mounted Police in Canada. And he also said that he didn't want to be calling from a phone where there could be a toll record of the call.

Nexus Transcript 30:18–22 (hereinafter "TR"). *See also,* N–13. Whenever Feroce wanted to talk to the agents, he drove 40 miles from Vancouver, British Columbia, Canada, to Washington in order to call them.[26]

In addition to frequently driving across the border to the United States to telephone DeCotiis, Feroce also flew from Vancouver to San Francisco Airport for a meeting with DeCotiis on June 9. At their meeting in San Francisco, they talked about the communication frequencies to be used by the vessels as well as other details of the operation. *See* N–13.

While the land-based conspirators continued to meet and discuss the venture, the Lucky Star and the Barbara H. were attempting to connect. The vessels, using the code names Lady Di and Melissa, respectively, made their first radio contact on June 18, 1991. *See* N–9. At about this time, Feroce learned that there were problems developing between the vessels. He contacted Ezidro, who told him that "Charlie" was in charge of communicating with the Lucky Star but was in Singapore. Over the next few days, Rockom on the Barbara H. and McNelly aboard the Lucky Star spoke by radio several more

times to discuss the mechanics of the transfer. *See, e.g.,* N–10. The vessels attempted to offload on June 22 and 23, 1991. The rough seas, and the apparent intransigence of the Lucky Star's master, who was unwilling to move the hashish in the manner suggested by the Barbara H., made the offload very difficult, and ultimately only 2.4 tons of hashish were transferred from the Lucky Star to the Barbara H. The Barbara H. was slightly damaged in the process. After the 2.4 tons were loaded onto the Barbara H., the Barbara H. refused to continue the transfer because it was too dangerous and suggested moving to calmer seas. The Lucky Star refused and insisted on completing the offload in an area to the west of the offload location. At a standoff, Rockom and McNelly communicated by radio several times to try to arrange another offload attempt. *See, e.g.,* N–11. During these negotiations with the Lucky Star, the Barbara H. radioed DeCotiis to inform him and the shore-based conspirators of the complications they were facing in arranging a second rendezvous and completing the delivery.

Upon learning of the problems between the Lucky Star and the Barbara H., the shore-based conspirators initiated serious efforts to try to complete the offload of the remaining 68 tons. A flurry of activity ensued at the end of June and beginning of July. For example, Ezidro and Feroce gave DeCotiis several messages for the Barbara H. to give to the Lucky Star in the hopes that they would induce the Lucky Star to cooperate, but to no avail. Ezidro then directed Feroce to have Decotiis contact "Charlie" and gave him Sotirkys' California telephone number. At this point, DeCotiis began a series of telephone conversations with Sotirkys, ultimately speaking with him 17 times between June 28 and July 3. DeCotiis and Sotirkys also met in Sausalito, California, on June 29 and July 2. All of these contacts occurred when both men were in the San Francisco Bay Area. None occurred in Canada or Singapore.

---

**26.** For instance, on May 11, 1991, Feroce paged Rockom from a pay telephone in Seattle. Rockom called Feroce back and they discussed preparations for the offload. *See* N–6. Similarly, on June 6, Feroce drove down from Vancouver to Washington to call DeCotiis from a pay telephone. Trial Ex. 111D.

During this time, other conspirators were also communicating frequently. Feroce and DeCotiis spoke by telephone repeatedly. Feroce and Medjuck also had several telephone conversations to discuss the problems with the offload. In at least one conversation, Medjuck was in the San Jose International Airport on his way to Las Vegas when he called Feroce in Vancouver. Trial Ex. 40.

Sotirkys gave DeCotiis several messages to give to the Lucky Star via the Barbara H. Several used the word "Stargen" or "Starjan," a code word that referred to Sotirkys. One such message directed McNelly to call the "Andy Martin Answering Service." The Andy Martin Answering Service was actually a telephone number and answering machine for Sotirkys.[27]

Sotirkys' messages to the Lucky Star were unavailing, and the two vessels were unable to make another rendezvous. McNelly asked the Barbara H. to tell Sotirkys that the Lucky Star had been instructed to return home "by the main office" and that Sotirkys needed to contact the main office. N–12. The Lucky Star began heading west, away from the Barbara H.

Because of the difficulties and the damage it had suffered, and because the Lucky Star was apparently returning to Pakistan, the Barbara H. and the 2.4 tons of hashish returned to Honolulu on June 28, 1991. The shore-based conspirators did not know that the Barbara H. planned to go to the United States, nor did they agree with the plan to bring the hashish to this country in advance.

Unbeknownst to the conspirators, the United States Navy stopped the Lucky Star on the high seas on July 1 as the freighter was traveling west. By July 11, the United States government received the consent of St. Vincent, the flag nation of the Lucky Star, to exercise its jurisdiction over the vessel.

Medjuck, Sotirkys, Feroce, and the others were unaware of the fate of the Lucky Star in early July, and their diligent efforts to make the offload succeed continued unabated. During this time, all of the conspirators were deeply involved in trying to get the multi-ton load of hashish to shore. For instance, on approximately July 1, Feroce met with Medjuck and Ezidro and told them that the communications between the Lucky Star and the Barbara H. had broken down, and that the Barbara H. had returned to Hawaii. Medjuck and Ezidro told Feroce to go to Hawaii to meet with Rockom and Gallion. At the same time, both Feroce and Sotirkys kept in frequent communication with DeCotiis. Sotirkys told DeCotiis that he was going to Singapore to meet with the owner of the vessel to try to resolve the problems and get the hashish back to North America. On July 4, 1991, Medjuck arrived at the San Francisco International Airport. Medjuck and Sotirkys met with each other in a limousine ride from the airport in which Medjuck was dropped off at San Francisco's Mandarin Oriental Hotel and Sotirkys was taken to his girlfriend's home in Sausalito, California.[28]

Sotirkys flew to Singapore shortly after this meeting with Medjuck. Fernando testified that Sotirkys returned to Singapore in mid-July and met with Fernando, Razak–Sunesra, Ferdous, and Captain Malapit to discuss the problems with the smuggling venture.

Meanwhile, Feroce remained in Hawaii, meeting with Rockom and Gallion. On July 12, 1991, he learned from the media that the Lucky Star had been seized by the United States Navy on the high seas. Feroce discussed the seizure with Rockom and Gallion, still unaware that they were Customs Agents. He returned from Honolulu to Vancouver the next day and again met with Medjuck and Ezidro to talk about the fate of

---

**27.** In addition to instructing McNelly to call the Andy Martin number, Sotirkys also gave that number to Fernando in Singapore and DeCotiis in California. Fernando testified that he called that number on several occasions throughout the conspiracy from pay telephones in Singapore, and on June 28, 1991, called that number from his home. *See* N–38. He also testified that he was with Captain Malapit numerous times when

Malapit called the Andy Martin number. DeCotiis contacted Sotirkys through that number as well.

**28.** The testimony of Mazsen Alchawa, the limousine driver, was corroborated by the FBI agents who had the conspirators under surveillance at the time.

the Lucky Star and its crew and the failed smuggling operation.

The July 12, 1991 announcement that the Lucky Star had been seized ended the MDLEA conspiracy charged in the first three counts of the Indictment.[29]

## IV. NEXUS DEMONSTRATED

Having set forth the relevant law of nexus, and having outlined the facts of the conspiracy, the Court now turns to whether nexus has been shown for due process purposes with respect to both Sotirkys and Medjuck.

### A. *Caicedo Definition*

As stated in Section II.D, *supra*, nexus is defined as: "a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests." *Caicedo*, 47 F.3d at 372.

▓ The facts amply demonstrate "a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests." *Caicedo*, 47 F.3d at 373. The Ninth Circuit has held "[w]here an attempted transaction is aimed at causing criminal acts within the United States, there is a sufficient basis for the United States to exercise its jurisdiction to arrest and try the offenders." *Peterson*, 812 F.2d at 493. *See also, Davis*, 905 F.2d at 249. The evidence confirms that Medjuck and Sotirkys participated in criminal acts within the United States through their conduct in furtherance of the conspiracy. In order to prove a conspiracy, the government must show "(1) an agreement to accomplish an illegal objective, (2) the commission of an overt act in furtherance of the conspiracy, and (3) the requisite intent necessary to commit the underlying offense." *United States v. Matta–Ballesteros*, 71 F.3d at 765. A conspiracy is complete when the conspirators agree and one conspirator has done one overt

act in furtherance of the agreement, even if the object of the conspiracy is never achieved. *See, e.g., United States v. Bosch*, 951 F.2d 1546, 1550 (9th Cir.1991). Here, the conspirators carried out many acts in furtherance of their unlawful conspiracy within the United States and demonstrated more than sufficient connections with the United States. The evidence with respect to each defendant will be summarized.

### 1. *Medjuck*

The evidence with respect to defendant Medjuck demonstrates that while his personal contact with the United States was not extensive, his connections with this country are sufficient to justify his prosecution here. Medjuck knowingly directed his agents to use the United States to plan and conduct the conspiracy, and he himself conducted some of the business of the conspiracy from this country.

The Court first looks to Medjuck's extensive indirect connections with the United States. These indirect connections to the United States resulted when Medjuck sent Feroce to the United States first to locate a boat and captain for the job, then to deliver U.S. currency to a United States boat captain in order to hire an American boat and crew to meet the Lucky Star in the middle of the high seas to offload the 70 tons of hashish, and finally to repeatedly communicate with their Seattle and San Francisco-based cohorts.

Medjuck sent Feroce and Hayden to the United States to hire a boat and crew for the offload and gave them expense money. It could have come as no surprise to him that when Feroce and Hayden went to Hawaii on their quest, they found a boat manned by Americans who would want to be paid in American money. Knowing that the crew of

---

**29.** While the 70-ton smuggling operation failed, the 2.4 tons that had been loaded onto the Barbara H. were taken by the government to Hawaii and then to the San Francisco Bay Area. The undercover agents negotiated with Hayden and Feroce in an effort to dispose of the hashish. Feroce, Hayden, Ainge, Stanley and Shantz were arrested in Clear Lake, California, on September 18, 1991 as they tried to take possession of the

load. Medjuck was arrested in Seattle the next day. At that time, Medjuck was carrying an airline ticket to San Francisco. While there was some evidence to suggest that Medjuck was involved in a conspiracy with respect to the 2.4 tons, he was acquitted of those charges. Sotirkys was likewise acquitted of any charges related to the 2.4 tons in his 1993 trial.

the Barbara H. was based in Hawaii and/or Seattle, Medjuck nonetheless directed Feroce to hire them. Medjuck was also necessarily aware that communications would both originate in and be directed to the United States, since Agent DeCotiis, the land-based conspirators' shore-to-ship radio operator, was based in the San Francisco Bay Area. In fact, Medjuck himself had telephone contact with DeCotiis.

Though it was burdensome, Medjuck was willing to pay his American crew in U.S. dollars. Medjuck's approach to the problem of paying the American crew was explained by Feroce in a recorded conversation with Rockom:

> And he also indicated that you know obviously you guys wanted the money in American dollars, right? * * * * And since you know, since we're working in Canada, right. * * * * So, so so, so basically for them to take in ta' ... take American money. They usually take Canadian money to America. * * * * Trade it in America. So then they gotta' take the money and ship it back across the border again right. Ship it back into Canada. * * * * And ... basically you figure you know it's a little bit difficult for him ... to ... he said he's gonna start workin' on it, but to convert money into American money you can't do you know millions of dollars at a whack right.

N–7.

But despite the difficulties, Medjuck had both direct and indirect connections with the United States in his efforts to pay the crew in U.S. currency. Medjuck arranged for a courier to meet twice with Feroce in Seattle to give him the money. Before Feroce's first meeting with Rockom in Seattle on May 13, Medjuck instructed Feroce to go to Seattle and to register at the Four Seasons Hotel, and then telephone him. Medjuck was in Pebble Beach, California, at the time. When Feroce called Medjuck in California from Seattle, Medjuck told him to meet a courier in the hotel lobby and to refer to golfing in Pebble Beach. Feroce complied and the courier gave him a paper bag containing $45,000 in American money. When Feroce met with Rockom at the Seattle–Tacoma Air-

port, he gave Rockom the U.S. currency he received from the courier. A week later, and again at Medjuck's direction, Feroce again met the courier at the Seattle Four Seasons Hotel prior to his second Washington meeting with Rockom. The courier gave Feroce $125,000 in U.S. currency and 225,000 Swiss Francs which Feroce then gave to Rockom at their May 22 meeting.

Feroce too had extensive connections within the United States. Whenever Feroce, who was apparently Medjuck's right-hand man for at least this portion of the conspiracy, wanted to communicate with any of the smugglers based in the United States, he drove from Vancouver across the United States border to Washington state so that he could make telephone calls from American pay phones. Feroce thus deliberately came into the United States repeatedly for the express purpose of carrying out the conspiracy. Indeed, he did so specifically in order to evade Canadian law enforcement authorities, believing that international calls were more likely to be monitored, and believing that Canadian monitoring was more sophisticated than United States monitoring.

Feroce's deliberate use of the United States can be imputed to Medjuck for several reasons. First, Feroce testified that Medjuck instructed him not to use Canadian phones for the conspiracy. Second, Feroce was acting as Medjuck's agent when he made the phone calls. Medjuck was well aware that Feroce was operating in the United States—he spoke with Feroce before, *during* and after Feroce's trip into this country to find the crew. Medjuck also spoke with Feroce before and after his two meetings with Rockom in Seattle, and about his many sojourns into the United States in the course and conduct of the conspiracy. Finally, Feroce's actions were part of the conspiracy, and are therefore chargeable to Medjuck (and to Sotirkys), since "[w]hen one agrees to be a member of a conspiracy, one agrees to all acts that have been or will be committed by that conspiracy, and, by virtue of that agreement, is responsible for such acts regardless of one's role in the commission." *United States v. Inafuku*, 938 F.2d 972, 974 (9th Cir.1991).

But in addition to directing Feroce and others to do his bidding in the United States, Medjuck himself had direct contacts with the United States. Even assuming that the actions of his co-conspirators and agents could not be imputed to him for nexus purposes, Medjuck himself had significant connections with the United States relating to the unlawful conspiracy. In early June, Medjuck spoke with DeCotiis, who was in San Francisco, about the details of the smuggle. On June 27, 1991, Medjuck called Feroce from the San Jose Airport to ask "is the other thing working?" Trial Ex. 40. Feroce gave Medjuck an oblique update, telling him that he had passed messages "through our guys" and was awaiting word from the Lucky Star. *Id.* More importantly, Medjuck came to San Francisco on July 4th and had a private meeting with Sotirkys in a limousine en route from San Francisco International Airport to Medjuck's hotel. While the government has not offered any direct evidence about what Medjuck and Sotirkys discussed,[30] and while Medjuck has offered alternate explanations for being in San Francisco, this trip occurred during the height of the conspirators' efforts to turn around the Lucky Star, which was then apparently headed back to Pakistan, and to complete the offload of the remaining 68 tons of hashish. This San Francisco meeting between Medjuck and Sotirkys also occurred shortly before Sotirkys flew to Singapore to meet with the hashish sellers and the owner of the Lucky Star. Although the Lucky Star had been stopped by the U.S. Navy at this time, none of the conspirators were aware of the interdiction. Thus, the preponderance of the evidence certainly suggests that during this crucial time, Medjuck and Sotirkys met to discuss the Lucky Star and the efforts to land the huge load of hashish. This meeting in furtherance of the conspiracy occurred on U.S. soil.

### 2. *Sotirkys*

As with Medjuck, the actions of Sotirkys' co-conspirators can be imputed to him. *Inafuku,* 938 F.2d at 974. But putting aside any vicarious liability, plenty of evidence demonstrates a sufficient connection between So-

tirkys' conduct in the conspiracy and the United States. While Sotirkys argues that the conspirators' plan was that his involvement was to end in Singapore, and that it was coincidence that he was in the Bay Area at the time the difficulties with the load materialized in late June, the hallmark of many conspiracies is their flexibility. Conspirators are often willing to change their plans as circumstances change. The fact remains when the need arose, Sotirkys took numerous steps in furtherance of the conspiracy from California.

Sotirkys had copious connections with the United States in the course of this conspiracy. While in the San Francisco Bay Area during a crucial time in the venture, he had a private meeting with Medjuck, the purchaser of the hashish. He had two meetings in Sausalito with Agent DeCotiis to discuss methods by which the offload could be completed. He had 17 telephone conversations with DeCotiis in which both he and DeCotiis were in the Bay Area. In those 17 conversations, they talked about and planned the conspiracy. From the Bay Area, Sotirkys passed messages to David McNelly directing McNelly to "accommodate" the Barbara H. From the Bay Area, he passed a message telling McNelly to call him at the Andy Martin Answering Service, a telephone number located in Sausalito, California. Before leaving Singapore, he told Fernando he could be reached at the Andy Martin number. In fact, Fernando called that telephone number numerous times, including on June 28, 1991, during the height of the problems with the Lucky Star. N–38. Sotirkys also gave DeCotiis that number, and DeCotiis used it to contact him. Thus, Sotirkys maintained a Bay Area telephone number which he used in conducting the conspiracy. Though concentrated in a relatively brief span of time, Sotirkys' connections with the United States in the course and furtherance of this conspiracy were considerable.

### 3. *Showing of Nexus*

The preponderance of the evidence clearly shows that both Medjuck and Sotirkys delib-

---

**30.** The driver of the limousine testified that upon entering the car, Medjuck and Sotirkys turned on the stereo and raised the divider, so that the driver could neither see nor hear the passengers.

erately and repeatedly used the United States to plan and carry out the conspiracy with respect to the 70 tons of hashish. Both defendants had significant connections with the United States in the course of their illegal venture. While the ultimate goal of the conspiracy may have been to import hashish to Canada, it was undeniably "aimed at causing criminal acts within the United States." *Peterson*, 812 F.2d at 493.

Defendant Sotirkys argues that due process is offended in this case because the government "manufactured" nexus. He argues that this case is analogous to *United States v. Archer*, 486 F.2d 670 (2d Cir.1973). In *Archer*, federal law enforcement officers manufactured a totally fictitious crime in order to investigate corruption at a local district attorney's office. As part of their attempt to create federal jurisdiction in what would otherwise have been a state crime, federal agents initiated three interstate or foreign telephone calls. In one call, an agent drove from New York to New Jersey solely in order to be able to call the defendant from another state. The defendant also called Las Vegas from New York in a futile effort to reach the agent at a number at which the agent could not be found. In the third call, the agent happened to be in Paris when he telephoned the defendant. The Second Circuit found that these calls did not supply the necessary federal jurisdiction, holding that "the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present." *Id.* at 682. The *Archer* court warned that "[m]anufactured federal jurisdiction is even more offensive in criminal than in civil proceedings." *Id.*

However, this case is clearly distinguishable from *Archer*. It is true that DeCotiis was in the United States when he spoke to Sotirkys. However, it was not DeCotiis' presence in this country that created his nexus, it was Sotirkys'. Federal agents did not lure either Sotirkys or Medjuck into the United States. Medjuck went looking in the United States for an American boat crew; his contacts with the United States flowed from his initial foray into this country and his repeated actions here, including the use of

the United States as a communications base. Sotirkys was in California at the time troubles arose with the Lucky Star. From the United States, Sotirkys took numerous steps in furtherance of the conspiracy, performing many communication functions that are crucial in a modern, multinational drug conspiracy. He initiated and received phone calls with DeCotiis. He choose the site in Sausalito where he met with DeCotiis. He passed messages to the Lucky Star from California. He met with Medjuck in California. The evidence clearly establishes that the government did not manufacture his connections with the United States; Sotirkys himself created nexus.

Contrary to the defendants' portrayal of events, this is not a case in which the United States reached out to Canada and asserted jurisdiction over a wholly Canadian conspiracy to import hashish. It is not the case that the conspiracy was conducted in and from Canada with no United States involvement or connection. Instead, the evidence of connections between the defendants' criminal conduct and the United States is mountainous. In light of all of the evidence presented, this Court is compelled to conclude that both Medjuck and Sotirkys had a sufficient connection with the United States such that this country's assertion of jurisdiction over them is consistent with due process and is neither arbitrary nor fundamentally unfair.

### B. *Khan Definition*

Defendants have urged the Court to apply the definition of nexus mentioned in *Khan*. In *Khan*, the Ninth Circuit held that in order to show nexus, "the government must show that the plan for shipping the drugs was likely to have effects in the United States." *Khan*, 35 F.3d at 429. Although the Court believes the *Caicedo* definition is the appropriate one, it also finds that the *Khan* standard of nexus has been satisfied here. 1. *Destination*

Before addressing this evidence, the Court first addresses the destination of the hashish. The defendants have urged this Court (as well as the Ninth Circuit) to conclude that nexus requires that the hashish be destined for the United States. As stated above, the

Court rejects that definition of nexus. However, the Court notes that the government has not proved that the hashish was destined for the United States by a preponderance of the evidence. In fact, only minimal evidence supports the proposition that the hashish was bound for the United States rather than Canada. The evidence of United States destination consisted of the testimony of Fernando, the undercover agents' testimony about statements Feroce made to them, and the expert testimony and other evidence regarding hashish use in the United States and Canada.

Fernando testified that at several of the meetings held in Singapore during the planning of the conspiracy, the destination of the hashish was discussed. At one of the initial meetings, Razak–Sunesra told Fernando that the hashish was bound "either for Canada or States." TR 397:20–398:4. At another meeting, Hartong told Fernando the hashish was "going to Canada and a portion to the States" and that the buyers were American. TR 402:9–403:10.[31] At a meeting about the procurement of the Lucky Star, Razak–Sunesra expressed concern that Razak the shipowner would "double cross them and sell [the hashish] to some other American people." TR 425:6–8. At a meeting to discuss the transfer of hashish from the Saratoga Success to the Lucky Star, Sotirkys said that the "rendezvous point" would be "off Canada or off Hawaii." TR 430:10–15. Finally, at one of the meetings, Fernando asked Sotirkys how Canada could consume such a large quantity of hashish. Sotirkys told Fernando that some of the hashish would "probably" go to the United States. TR 434:3–12.

The undercover agents also testified that they had been told that the hashish was bound for the United States. An FBI report indicates that confidential informant Michael Culbertson told FBI agents that when he asked Feroce where the hashish was going, Feroce said it would be going to the "East Coast." While Feroce did not specify whether it would be the East Coast of Canada or of the United States, Culbertson assumed he meant the East Coast of the United States. Culbertson also reported that Feroce mentioned that some of the hashish would be available in New York and in Illinois.

Agents Rockom and Gallion also testified that Feroce told them that the hashish was headed for the United States. Rockom testified that Feroce said the hashish was bound for New York, and also that the hashish would be transported across the Canadian border into the United States in the farmland region along the border. Agent Gallion testified that Feroce told him the drugs would be transported in small quantities into the United States. However, Feroce repudiated those statements. In an interview with the agents in January of 1992, Feroce said that he could not recall telling Rockom that the hashish was bound for New York. During his testimony in these proceedings, however, Feroce said that he recalled telling the agents that the hashish was bound for New York. Nonetheless, Feroce said that this statement on his part was pure speculation, and that Medjuck had never told him that the hashish would end up in the United States. He did deny telling Rockom that the hashish would be transported across the farmland, and denied telling Gallion that it would be sent to the United States in small quantities.

The Court finds that this evidence does not establish that the conspirators intended to have the Lucky Star's load of hashish come to the United States.[32] Instead, the evidence

31. While Sotirkys has argued that some of these statements preceded his involvement in the conspiracy, a defendant who joins an existing conspiracy is "bound by all that has gone before in the conspiracy, even if unknown to him." *United States v. Umagat*, 998 F.2d 770, 772 (9th Cir.1993) (citation omitted). This is so as long as the conspirator's "understanding with co-conspirators 'was of sufficient scope to warrant the conclusion that he embraced the common purpose of the conspiracy.'" *Id.*

32. In *Khan*, the court concluded that the hashish aboard the Lucky Star was destined for the United States, relying on the fact that the backup landing sites were Alaska and California, and that the drugs were to be trucked overland to New York. *Khan*, 35 F.3d at 429. The *Khan* court held that "the purpose of the smuggling operation was to bring drugs into the United States." *Id.* The evidence before this Court does not support such a finding. There was no evidence that the conspirators ever made serious plans to use any landing sites in the United

supports the proposition that conspirators intended to import the hashish to Canada. For example, when Feroce hired Rockom and Gallion, they planned for the offload vessel to meet a tug and barge behind Banks Island in the Queen Charlotte Sound and to offload the hashish onto two semi-trailers on the barge. They would tow the barge up the Fraser River in British Columbia and then transport the 70–tons of hashish eastward by tractor-trailer. In addition, Feroce told the agents during the course of the conspiracy that the operation was not set up to work in the United States and that the operation was completely Canadian. While the agents suggested back-up landing sites in Alaska and California, there is no evidence that serious plans were made whereby the Barbara H. would come to the United States rather than to Canada with the 70–ton load. Finally, the government dismissed the count against Medjuck charging him with importing into the United States.

Taken together, this evidence does not establish by a preponderance of the evidence that the conspirators intended to deliver the hashish to the United States. Nonetheless, the government has shown by a preponderance of the evidence that the plan for shipping the drugs was likely to have effects in the United States.

### 2. Effects of Plan

First, as discussed extensively above, the *plan* for shipping the drugs had effects in the United States. As the court found in *Khan*, this Court finds that the conspirators used the United States for the "coordination and control of the conspiracy." *Khan*, 35 F.3d at 429. The plan itself called on the defendants to use an American boat and crew; U.S. phones were readily and repeatedly used; meetings occurred in the United States. The United States was thus used as a "communications base"—a vital function in a modern-day international conspiracy. In addition,

United States citizens were involved in many aspects of the conspiracy. Not only were Sotirkys, McNelly, Feroce, Stanley, Hayden, Ainge, and Ezidro all Americans, the plan also called for "Yanks" to offload the hashish in Canada and then return to the United States.[33] Therefore, the criminal plan undoubtedly had effects in the United States.

In addition, the Court finds that had the drugs been delivered to Canada as planned, the drugs themselves would likely have had effects in the United States. Sergeant Jean Martin of the RCMP testified as an expert witness. In his opinion, both geography and economics dictated that at least some of the hashish would likely come to the United States. He testified that in his expert opinion, the Canadian hashish market could not absorb 70 tons of hashish. He testified that eastern Canada, where most of the Canadian population resides, experienced a hashish shortage at the end of 1990 and a corresponding increase in the price for hashish. In 1991, the price for hashish remained stable, which in Martin's expert opinion indicated that there was a steady supply of hashish in 1991 and the price was not affected by fluctuations in supply. He further testified that in his experience, drug suppliers would be concerned about not flooding the Canadian market with an overabundance of hashish for fear of lowering the price. Martin testified that he believed that some of the 70 tons of hashish would stay in eastern Canada, but that "the major part of it would have to be shipped to the United States for sale." TR:312:4–5. In Martin's experience, five-to-ten tons of hashish are shipped into Canada every two-to-six months, and in his opinion, 70 tons was a great deal of hashish to bring on to the market at one time. Martin opined that a number of factors argued against the possibility that hashish suppliers would cache their merchandise in order to release it slowly. Stockpiling increases the risk of detec-

States. In addition, Feroce said that the reference to transporting the drugs to New York was his alone and not part of the plan of the smuggle.

**33.** The conspirators planned to have "Yanks" come up to Canada, transfer the hashish onto the trucks, and then return to the United States in order to impede any Canadian investigation of

the operation. Because the Americans would not be known to potential witnesses in Canada, they would be difficult to identify. Because they would immediately leave Canada and return to the United States, they would also be difficult to arrest.

tion. In addition, the large amount of money involved would mean that people involved in the operation, including suppliers, investors, and others, would generally be unwilling to wait to realize their gains. Sergeant Martin also testified that in his opinion, the hashish market in Canada was the same size as the hashish market in the United States, and that the hashish was therefore likely to end up in the United States.

With respect to geography, Sergeant Martin testified that the major turnpike connecting Montreal with the United States border was a main route of importation of hashish from Canada to the United States.

Defendants introduced evidence suggesting that Canada is a much bigger market for hashish than is the United States. For instance, the 1993 report of the National Narcotics Intelligence Consumers Committee noted: "The United States does not constitute a large market for hashish.... Canada, however, is a major market." *The NNICC Report 1993: The Supply of Illicit Drugs to the United States* (August 1994) at 67. (N–I). *See also, The NNICC Report 1991: The Supply of Illicit Drugs to the United States* (July 1992) at 51 (N–B); *The NNICC Report 1992: The Supply of Illicit Drugs to the United States* (August 1994) at 37 (N–C).[34] Medjuck also argued that because the penalties in the United States are so high, the conspirators did not intend for the drugs to come to the United States.

While it appears that the hashish market in the United States is not as large as that in Canada, in light of all the evidence, the Court finds Sergeant Martin's expert testimony about the economics and geography of the hashish trade is compelling. The evidence suggests that the hashish was bound for the populous eastern portion of Canada rather than to the sparsely populated western Cana-

da.[35] Seventy tons is an extraordinary amount of hashish to go to market in eastern Canada at one time. While hashish use may be more popular in Canada than it is in the United States, Canada has a much smaller population than does the United States.[36] The Court finds that the small Canadian population would be unlikely to be able to absorb the huge load imported by Medjuck and his confederates. The Court therefore concludes that both economics and geography dictate that at least some portion of the hashish would at some point be found in the United States. Even if the conspirators themselves did not intend to import the hashish into the United States, it is very likely that some of this exceptionally large supply would find its way across the permeable U.S. border. While this evidence does not establish that the hashish was destined for the United States, the Court finds that it is enough to show the hashish would likely have effects in this country, thereby satisfying the *Khan* definition.

## V. POLICY IMPLICATIONS

In enacting the MDLEA, Congress stated: "The Congress finds and declares that trafficking in controlled substances aboard vessels is a serious international problem and is universally condemned. Moreover, such trafficking presents a specific threat to the security and societal well-being of the United States." 46 U.S.C.App. § 1902. The Eleventh Circuit observation in 1982 that "there is growing consensus among nations to include drug trafficking as a universally prohibited crime," *United States v. Marino–Garcia*, 679 F.2d 1373, 1382 n. 16 (11th Cir. 1982), has become more apt over the last decade and a half. The Ninth Circuit has recently noted that there is no jurisdiction in which drug trafficking is legal. *Caicedo*, 47

---

**34.** Defendant Medjuck additionally submitted government pleadings from a federal prosecution in Boston in which the United States Attorney represented to the court that a 3–ton load of hashish seized in Boston Harbor was headed to Canada.

**35.** While the hashish was to be brought to shore on Canada's west coast, Medjuck had arranged for truckers to meet the load in British Columbia, and from there truck it in semitrailers across

western Canada to Montreal. There is no evidence that the conspirators planned to distribute the hashish to users in western Canada.

**36.** Canada has a population of only 28 million people, with most of its population clustered in eastern Canada. *The World Almanac and Book of Facts: 1996* 749 (Robert Famighetti, ed., Funk & Wagnalls) (1995).

F.3d at 373. While drug trafficking has not yet been included in the same category as slave trafficking and piracy, which would "extend the criminal jurisdiction of the United States to all foreign vessels on the high seas that are engaged in drug trafficking," *Marino–Garcia*, 679 F.2d at 1382 n. 16, neither has the United States become a safe haven from which international drug dealers may conspire and plan, so long as they do not plan to distribute in the United States.

Defendants argue that due process is offended unless the government proves that the drugs were destined for the United States. The Court finds that it is not so long as the connections between the criminal conduct and the United States are sufficient. The United States has stated that its drug control policy includes a significant international component, incorporating

> programs for effectively attacking international production and trafficking.... A cornerstone of our international drug policy must be a determination to work with and motivate other countries to engage their own resources and efforts to defeat trafficking. Only through broad, cooperative international efforts can we reduce the foreign drug supply to our country while motivating other nations to assist us in our drug control efforts and combat the drug menace themselves.

U.S. Office of National Drug Control Policy, *National Drug Control Strategy* at 61 (The White House, 1989). *See also, id.* at 106, 116. In keeping with its policy, the United States' government sanctions foreign nations which do not fully cooperate in this country's drug control efforts. *See, e.g.,* Jose de Cordoba and Carla Anne Robbins, *U.S. Rebuke Puts Columbia's Samper In The Hot Seat,* Wall.St.J., Mar. 4 1996. In addition, a significant part of the money the government spends in its "War on Drugs" is devoted to international efforts. For instance, in 1994, over $300 million dollars of the government's $12 billion dollar federal drug control budget was internationally allocated. Kathleen Maguire and Ann D. Pastore, eds., *Sourcebook of Criminal Justice Statistics 1994,* U.S. Department of Justice, Bureau of Justice Statistics (1995).

In light of this policy, to hold that the United States did not have jurisdiction in this instance would be to allow this country to be a safe haven for drug lords. If the law permitted the United States to be used as a base from which conspirators could plan and conduct their importation schemes so long as the drugs were going to some other country, the United States would become a sanctuary for drug conspirators. In this era of large international drug conspiracies and of electronic communications, having a secure base for communications and coordination is crucial. If United States destination was required in order for this country to have jurisdiction, the United States would become such a safe communications base. Drug dealers wishing to import drugs to Canada or Mexico (and perhaps thereby indirectly to this country) could base their operations, including vital communications headquarters, in the United States so long as they did not directly import drugs into the United States. Such a result would be anomalous at a minimum in light of this country's significant efforts to enlist foreign countries in the United States' "War on Drugs." It would be ironic indeed if the United States were to carry out diplomatic and economic policies designed to enlist other countries in its War on Drugs, punish foreign states that did not comply, and devote significant resources to keeping drugs out of this country, but were nonetheless willing to become a safety zone from which drug lords could plot their crimes upon other nations. The Court finds that due process does not compel this result. United States destination is not required in general, nor is it required here in light of the evidence of the extensive connections between both Medjuck and Sotirkys and their criminal conduct and the United States. These connections are more than "sufficient to justify the United States' pursuit of its interests." *Caicedo,* 47 F.3d at 372.

## VI. CONCLUSION

The Court has carefully considered the relevant authority on both the procedure and the substance of the nexus requirement. It has heard the nexus evidence with respect to both defendants, and has had the opportunity

to review the credibility of all witnesses. The Court concludes that there is a sufficient connection between both defendant Medjuck and defendant Sotirkys and the United States so as to justify this country's assertion of jurisdiction in the matter. Due process is not offended by this prosecution in light of the involvement of the United States in the crime. While the majority of the evidence supports a finding that the conspirators intended that 70–ton load of hashish be shipped to Canada, the facts compel the conclusion that much of the conspiracy itself took place on United States' soil. The conspirators took full and deliberate advantage of the United States in planning, coordinating, controlling and conducting their conspiracy. Defendant Medjuck and defendant Sotirkys had ample contact with the United States. Not only is the connection between their criminal contact sufficient to warrant the United States' interest in prosecuting the crime, failure to find such a connection would allow the United States to be a refuge for the planning and carrying out of large conspiracies to import drugs into other countries.

In the vernacular, the nexus inquiry asks this Court to determine whether prosecuting the crime is any of the United States' business. The Court finds that it most certainly is. It is not the case that this was a wholly Canadian operation in which the defendants had absolutely no connection with the United States. Nor is it the case that the United States has intruded into Canadian sovereignty or injected itself into Canada to "grab" Canadian defendants. In this light, the *Caicedo* discussion of nexus is worth repeating.

> A defendant would have a legitimate expectation that because he has subjected himself to the laws of one nation, other nations will not be entitled to exercise jurisdiction without some nexus. Punishing crimes committed on a foreign flag ship is like punishing a crime committed on foreign soil; it is an intrusion into the sovereign territory of another nation. As a matter of comity and fairness, such an intrusion should not be undertaken absent proof that there is a connection between the criminal conduct and the United States

sufficient to justify the United States' pursuit of its interests.

*Caicedo,* 47 F.3d at 372.

If Medjuck had hired a Canadian fishing vessel and Canadian crew, set up a Canadian communications base, used only Canadian currency, used Canadian telephones for only for domestic calls about the conspiracy, met only on Canadian soil, and had confederates who never ventured outside the Canadian border, his expectation that he would not be haled into the United States to answer for those acts would be reasonable. The United States would have little cause to prosecute him. Similarly, if Sotirkys had stayed in Singapore and communicated with the Lucky Star only from that country regarding a load destined for Canada, or if he had been in Canada and communicated only with others in Canada about the load, or if he had used a telephone number in Singapore or Canada for receiving messages about the conspiracy, due process would in all likelihood be offended by haling him into the United States. The defendants would have a legitimate expectation that the United States would not be entitled to proceed against them. But in this instance, the defendants purposefully acted in such a way that the United States was substantially involved in the conspiracy. They came repeatedly to the United States for the purpose of planning and carrying out their international conspiracy. The vast majority of the conspiracy's communications arose in or were directed to the United States. Indeed, this Court finds, as did the *Khan* court, that the "coordination and control of the conspiracy occurred in the United States." *Khan,* 35 F.3d at 429. Given these facts, this prosecution is no assault on due process. Again in the vernacular, the defendants made this case the United States' business.

The Court finds that the government has fully met its burden of showing nexus. Due process is not offended by the United States' prosecution of defendants Medjuck and Sotirkys for the violation of the MDLEA.

IT IS SO ORDERED.